IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

JOHNNY GILL                                                                   PLAINTIFF

VS.                            CASE NO. 07-CV-1091

CONAGRA POULTRY COMPANY and
PILGRIM'S PRIDE, INCORPORATED                           DEFENDANTS

## MEMORANDUM OPINION

Before the Court is Defendants' refiled Motion for Summary Judgment. (Doc. No. 14). The Plaintiff has responded. (Doc. No. 22). The Defendants have filed a reply to the Plaintiff's response. (Doc. No. 25). The matter is ripe for consideration.

## BACKGROUND

Johnny Gill is African-American. In 1980, he began working for the Defendant ConAgra Poultry Company at its chicken processing plant in El Dorado, Arkansas. Gill went to work in the rendering department of the plant. On or about November 24, 2003, Defendant Pilgrim's Pride purchased ConAgra Poultry, along with the El Dorado processing plant. After the acquisition, Gill continued to work at the plant. He is currently employed by Pilgrim's Pride as a maintenance man in the plant's rendering department.

During their respective periods of ownership, both ConAgra and Pilgrim's Pride maintained anti-discrimination policies at the plant. Each company's policy prohibited intimidation, harassment and hostile acts against employees. Each policy provided a mechanism for reporting discrimination and/or harassment complaints. Each company conducted anti-

harassment and discrimination training sessions for its employees. Gill knew of each company's reporting procedure as well as their confidential 1-800 hotline for reporting any work related problems.

Gill belongs to the United Food and Commercial Workers Union Local 2008, the Union at the plant. As a Union member, Gill could utilize the collective bargaining agreements' grievance procedure to file complaints about aspects of his employment, including any racial discrimination and/or harassment. The grievance procedure consisted of four steps through which the complaining employee and the company would attempt to resolve the dispute. If a resolution could not be reached after the third step, the employee could take the complaint to binding arbitration. Gill was aware of the Union's grievance procedure.

The rendering department is a stand alone facility that is separate from the main plant. It has its own bathrooms and own break room. The rendering department converts chicken by-products into useable forms for non-human consumption such as dog food. Rendering department employees use grinders and cookers to convert the by-products into useable forms. The converted products are then placed on trailers by use of forklifts and shipped to third-party businesses.

From 1980 to 1996, Gill worked in the processing areas of the rendering department. In this area, Gill operated a large storage cooker. Around 1994, Gill began taking classes at the local vo-tech school in order to obtain the training needed to qualify for a maintenance position at the plant. ConAgra paid Gill's tuition for these classes.

In 1996, after three previous attempts, Gill passed the maintenance test and was promoted to a maintenance position in the rendering department. Thereafter, Gill was promoted several

times within the maintenance department. In 1996, Gill was also designated the "lead person" on his shift. As the lead person, Gill was responsible for watching the shift and making sure everything was running properly when the supervisor was gone. He held this position until 2000 when John Woodall, the new plant manager, decided to eliminate the lead person position.[1] Gill is currently employed as a maintenance tech in rendering. As a maintenance tech, he is responsible for keeping the various machines within the department running.

Gill works maintenance on the evening shift from 3:00 p.m. until 11:00 p.m. He works with Eddie Gusby, an African-American. Gill and Gusby are the only two maintenance employees who regularly work the evening shift. Kenny Jackson, an African-American, is their direct supervisor. Ron Cross, a Caucasian, and George Holly, an African-American, work maintenance on the day shift. Randy Beaver is the day shift maintenance supervisor. Gill has little contact with Cross, Holly or Beaver as they are gone or just leaving when he arrives for work. However, if somebody has to stay and work overtime, Ron Cross will work the evening shift with Gill and Gusby. Gill and Gusby are replaced at 11:00 p.m. by the night shift. Billy Cook and Rodney Henry, both African-Americans, work the night shift.

During his tenure at the plant, Gill has been supervised by several individuals within the rendering department. In 1980, Bill Devault, a Caucasian, was the rendering department's supervisor. Devault supervised Gill from 1980 until 2000. Gill states that Devault maintained a "good environment" in the department and he believed that Devault was "the best." Gill has no

---

[1]. After the lead position was eliminated, Gill continued to perform the lead person's duties for one week. He claims that he wasn't paid the lead person's additional pay for that week. Thereafter, Randy Beaver, Gill's Caucasian supervisor, requested that Gill receive the addition pay. Gill was ultimately paid for the week. He now admits that he has been paid for all the lead person work he did.

complaints regarding Devault's treatment of him.

In 1996, when Gill was promoted into the maintenance department, Jerry Hunter, a Caucasian, was the maintenance supervisor. Gill has voiced no complaints regarding Hunter's treatment of him.[2]

In 2000, Walter Cribb, a Caucasian, and Kenny Jackson, an African-American, became Gill's supervisors. Cribb replaced Bill Devault as the rendering department's supervisor. Gill had little contact with Cribb because Cribb worked the day shift. When Gill arrived at work, Gribb would already be gone for the day. Kenny Jackson was the maintenance supervisor on the evening shift. Therefore he was Gill's direct supervisor. For a short time, Gill was also supervised by Randy Beaver, a Caucasian.[3] Gill has no complaints regarding his treatment by Jackson or Beaver. In fact, Gill states that he thought Beaver was fair and "a pretty good man." However, he does complain about Walter Cribb's treatment of him.

Gill claims that Cribb harassed him by not recognizing him for the good job he did. He states that Cribb was also negative about the maintenance work. Gill believes that this behavior was racist because he thinks that Cribb thought he was "a dummy" even though Cribb never told him that. Gill never complained to management or the Union about Cribb's bad attitude.

Gill claims that when the storage cooker broke down in 2003, he overheard Cribb say to

---

[2] Initially, Gill claimed that Jerry Hunter discriminated against him by keeping him out of rendering's maintenance department by requiring him to pass a maintenance test on his qualifications. Gill failed this test on three occasions. However, it appears that Gill has abandoned this claim as he is no longer maintaining actions against the Defendants for failure to promote or disparate treatment.

[3] Beaver was the day shift maintenance supervisor in the rendering department. For a short time, Gill worked on the day shift. Beaver was Gill's supervisor during that time.

4

himself that "maintenance men need to be lined up and shot." Gill admits that Cribb did not direct this comment toward him directly. He also admits that the group of maintenance men to whom Cribb was referring included Ron Cross, a Caucasian. The comment did not affect Gill's ability to do his job. Gill did not report Cribb's comment to management or the Union.

Gill also claims that during that same year Cribb hollered at him one time. The incident occurred when a meal truck had been overloaded and the maintenance men were having to scoop out the excess meal. Gill asked Cribb when they were going to begin doing maintenance work again. Cribb responded by yelling, "well, my boss told me to keep ya'll right here. What ya'll going to do, ya'll going to do it." Gill responded by saying, "that's fine with me." Gill believes that Cribb's outburst was racist because Gill is a grown man, not a kid. However, Gill admits that Cribb did not use any racial slurs when he yelled at him.

Gill claims that in 2002 Cribb assigned everyone in rendering maintenance additional jobs. He states that in January 2002, Cribb told him that, in order to save money within the rendering department, either the maintenance men would have to start performing some rendering production work or one of them would have to be laid off.

Thereafter, the maintenance men started doing production work along with their maintenance duties. These additional duties included turning on the blood pump, raking feathers in the feather truck, rolling a tarp over the feathers, loading the meal and fat trucks, and washing down the concrete slabs. All maintenance employees, whether they were African-American or Caucasian, were required to perform these new duties. Gill believes that he should not be required to do the production work because he has specialized training in maintenance. However, he does state that he did not mind doing the production work.

In 2004, two years after he was assigned the additional work, Gill and George Holly went to Michael Gooch, the plant's human resources director, and complained about having to do the additional work and not getting additional pay. They did not complain that the additional work assignments were racially discriminatory. Gill states that Michael Gooch told them that he would get back to them on the matter. He does not state whether Gooch did or not.

Gill now claims that performing this addition production work was racially discriminatory because most of the maintenance men in rendering were African-American. Gill makes this claim even though he admits that Ron Cross, a Caucasian, was a maintenance man on the day shift. Gill claims that Cross did not have to perform the additional duties because the day shift was busier and it had more employees that the evening shift. However, he does not make the same claim in regard to George Holly, the African-American maintenance man who worked with Cross on days.

Gill claims that in 1987, while walking out of the plant gate, he overheard a Caucasian maintenance man refer to an African-American co-worker as a "big fat black bitch." Gill states that hearing the comment bothered him but he did not report it to anyone. He just went out the gate and walked away.

Gill claims that in 1998, a Caucasian maintenance man hollered "Jigaboo, Jigaboo" in his and another African-American employee's direction. He does not know if the remark was directed at him or not. Gill did not report the racial slur to either management or the Union. Gill admits that hearing the remark did not affect his ability to do his work. Gill states that there were never any other racial slurs ever directed at him at the plant.

Gill also claims that he overheard Buck Gathwright, a rendering maintenance employee,

6

tell Eddie Gusby that he and Jerry Hunter, their Caucasian supervisor, went to the river and shot at a target they called "Little Eddie."  Gill believed that the target was in reference to co-worker, Eddie Gusby.  Gill never discussed the matter with Gusby and never complained to management or the Union about what he overheard.

Finally, Gill claims that in 2000, John Woodall, the plant's manager, called rendering's maintenance department on the phone and spoke to Gill.  He told Gill, "I want you to make sure those guys pick up the gloves back there."  Gill believed this statement to be racist.

Gill claims that profanity was directed to African-Americans at the plant.  However, he does not complain about any profanity ever being directed toward him.  Gill admits to he had a habit of using cuss words and profanity at work.

Gill claims that the bathroom walls in the plant and the rendering department were defaced with racially offensive graffiti.  None of the graffiti ever referred to Gill personally or threatened him physically.  He states that the writing offended him "in a way" but admits that he never complained to anyone about it.  He admits that it did not affect his ability to do his job.  He also admits that the offensive writing was painted over by the Defendants.

Gill claims that African-American employees received the bad or "dirty" jobs while Caucasian employees received the "clean" jobs.  He claims that the jobs in the rendering department are "dirty" jobs and the jobs in the main plant are "clean" jobs.  Gill admits that the main plant is overwhelmingly staffed by African-Americans.  There is also no evidence that Gill ever wanted or bid for any "clean" jobs in the main plant.

Gill claims that African-American maintenance men in rendering were ordered to do "dirty" jobs when Caucasian maintenance men were not.  However, Gill admits that he has seen

7

Ron Cross, the Caucasian maintenance man in rendering, performing "dirty" work just like the African-American maintenance men.

Gill also claims that African-American employees were not placed in HAZMAT duty while Caucasian employees were. However, Gill admits that the Defendants placed him in HAZMAT duty and he received HAZMAT pay.

Finally, Gill complains that the conditions in the rendering department were unsafe and the workers were required to perform work that was dangerous. Gill points to the maintenance men's job of pulling the tarp over the feathers on the feather trucks. He states that on one occasion, he fell off a feather truck and injured his wrist. However, Gill admits that all maintenance men, including Ron Cross and Randy Beaver, were required to pull the tarp on the feather trucks.

Gill has never complained to management or the Union about racial discrimination during his twenty-five plus years at the plant. In 2001, Gill filed a Union grievance in regard to working a split shift. Then, in 2004, he complained to Michael Gooch about having to perform additional work without being paid for it. However, in neither instance, did Gill claim that Defendants' conduct was based upon his race.

On December 22, 2003, Gill, along with seven other employees, filed a class action lawsuit against ConAgra and Pilgrim's Pride. In the Class Action Complaint, Gill alleged that he had been subjected to racial discrimination at the El Dorado plant. He claimed that the discrimination was in the form of disparate treatment, failure to promote, and a hostile work environment in violation of 42 U.S.C. § 1981 and the Arkansas Civil Rights Act of 1993.

On December 2, 2005, the Defendants moved for summary judgment on all of Gill's

claims. In his response, Gill stated that he was not maintaining a failure to promote claim against the Defendants. Thereafter, on March 28, 2006, the Court granted summary judgment as to Gill's claim for failure to promote. Summary judgment was denied as to Gill's disparate treatment and hostile work environment claims on the ground that merits-based discovery had not begun. The Court ruled that the motion was premature. It also ruled that it could be refiled at a later date.

On May 15, 2007, the Court denied the Class Action Plaintiffs' Motion for Class Certification. Thereafter, the parties agreed that each class representative would proceed with their individual claims in separate lawsuits under newly assigned case numbers. The parties also agreed that no additional discovery was needed and that the Defendants could refile their previously filed summary judgment motions against the individual plaintiffs.

On September 19, 2007, Gill filed his individual Complaint against the Defendants. On November 6, 2007, Gill amended his Complaint. In his Amended Complaint, Gill alleges that the Defendants discriminated against him because of his race in violation of 42 U.S.C. § 1981 and the Arkansas Civil Rights Act of 1993 ("ACRA"), Ark. Code Ann. § 16-123-102, 107. Specifically, Gill claims that he was subjected to a hostile work environment at the plant.[4] The matter is now before the Court on Defendants' refiled Motion for Summary Judgment.

## STANDARD OF REVIEW

The standard of review for summary judgment is well established. The Federal Rules of

---

[4] In his Amended Complaint, Gill did not reassert his claim for disparate treatment that was raised in the Class Action Complaint, *Goodwin, et al. v. ConAgra Poultry Company and Pilgrim's Pride, Incorporated,* 03-CV- 1187. Therefore, the Court will only address Gill's claim for hostile work environment in this opinion.

Civil Procedure provide that when a party moves for summary judgment;

> The judgment sought shall be rendered forthwith if the pleadings, dispositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c); *Krenik v. County of LeSueur,* 47 F.3d 953 (8th Cir. 1995). The Supreme Court has issued the following guidelines for trial courts to determine whether this standard has been satisfied:

> The inquiry performed is the threshold inquiry of determining whether there is a need for trial–whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc.,* 447 U.S. 242, 250 (1986). *See also Agristor Leasing v. Farrow,* 826 F.2d 732 (8th Cir. 1987); *Niagara of Wisconsin Paper Corp. v. Paper Indus. Union-Management Pension Fund,* 800 F.2d 742, 746 (8th Cir. 1986). A fact is material only when its resolution affects the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248. A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *Id.* at 252.

The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enterprise Bank v. Magna Bank,* 92 F.3d 743, 747 (8th Cir. 1996). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Id.* The nonmoving party must then demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. County of LeSueur,* 47 F.3d at 957. A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials,

but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 256.

## DISCUSSION

In his Amended Complaint, Gill alleges that he was subjected to a hostile work environment when he was subjected to abusive language at the plant, witnessed racial graffiti on the bathroom walls at the plant, witnessed African-American employees being treated differently than Caucasian employees in that they were treated in a disrespectful manner, subjected to unsafe working conditions and was required to do "dirty" jobs at the plant. He claims that this racial discrimination was in violation of 42 U.S.C. § 1981 and the Arkansas Civl Rights Act of 1993 ("ACRA"), Ark. Code Ann. § 16-123-102, 107.

In employment discrimination cases under 42 U.S.C. § 1981 and the ACRA, the courts apply the familiar three-step burden shifting framework set out in *McDonnell Douglas Corp. v. Green,* 41 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Putman v. Unity Health Sys.,* 348 F.3d 732, 735 n.2 (8th Cir. 2003)(applying *McDonnell Douglas* to § 1981 claim); *Crone v. United Parcel Serv., Inc.,* 302 F.3d 942, 945 (8th Cir. 2002) (applying *McDonnell Douglas* to ACRA claim). Under *McDonnell Douglas,* the plaintiff must first establish a *prima facie* case of discrimination. If the plaintiff is able to do this, the burden of production then shifts to the defendant to assert a legitimate non-discriminatory reason for the alleged discrimination. If the defendant sets forth such a reason, the burden then shifts back to the plaintiff to establish that the asserted reason was merely a pretext for discrimination. The Court will review each of Gill's claims in light of the above burden shifting framework.

Gill claims that he has been subjected to a hostile work environment at the plant. In order

to establish a racially hostile work environment claim, an employee must show that: 1) he was a member of a protected group; 2) he was subjected to unwelcome race-based harassment; 3) the harassment was because of his membership in the protected group; and 4) the harassment affected a term, condition, or privilege of his employment. *Elmahdi v. Marriott Hotel Services, Inc.,* 339 F.3d 645 (8th Cir. 2003). Harassment which is severe and pervasive is deemed to affect a term, condition, or privilege of employment. *Elmahdi,* 339 F.3d. at 652. The conduct must be severe "as it would be viewed objectively by a reasonable person and as it was actually viewed subjectively by the victim." *Id.* (quoting *Howard v. Burns Bros., Inc.,* 149 F.3d 835, 840 (8th Cir. 1998)). Merely feeling offended, however, does not sufficiently affect the conditions of employment to support a claim. *Id.,* 339 F.3d at 653 (citing *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993)). In determining whether sufficient evidence of a hostile work environment claim has been presented, courts consider all the attendant circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. *Elmahdi,* 339 F.3d. at 652-53. To satisfy the high threshold of actionable harm, the employee must show that his workplace was permeated with discriminatory intimidation, ridicule and insult. *Elmahdi,* 339 F.3d. at 653.

*Abusive Language at the Plant*

Gill claims that he was subjected to a hostile work environment by the Defendants when he was subjected to abusive language at the plant. There is no doubt that Gill is a member of a protected group – African-American. Thus, he can establish the first element of his *prima facie* case of hostile work environment. However, the Defendants contend that Gill can not show the

12

other elements of his *prima facie* case – that he was subjected to unwelcome race-based harassment, that the alleged harassment was because of his membership in the protected group and that it affected a term, condition or privilege of his employment.

In support of this claim, Gill claims that he heard two racial slurs in his twenty-five plus years at the plant. In 1998, a Caucasian maintenance worker yelled "Jigaboo, Jigaboo" in his and another African-American employee's direction. In 1987, he overheard a Caucasian maintenance man refer to an African-American co-worker as a "big fat black bitch." Although these slurs bothered him, they did not affect his ability to do his job. Also, Gill never reported either incident to management or the Union.

Two racial slurs in a twenty-five plus year period is not severe or pervasive enough to create a hostile work environment. *Woodland v. Joseph T. Ryerson & Sons, Inc.,* 302 F.3d 839, 844 (8th Cir. 2002). While offensive, such comments would not be viewed by a reasonable person as hostile. *See Singletary v. Mo. Dep't of Corrs.,* 423 F.3d 886, 893 (8th Cir. 2005). Such offhand comments and isolated incidents will not amount to a discriminatory change in the terms or conditions of employment. *Wallin v. Minnesota Dept. of Corrections,* 153 F.3d 681, 688 (8th Cir. 1998). It does not constitute a "steady barrage of opprobrious racial comment." *Elmahdi* 339 F.3d at 653 (quoting *Johnson v. Bunny Bread Co.,* 646 F.2d 1250, 1257 (8th Cir. 1981)). Thus, the incidents of which Gill complains are not sufficient to support his claim of a hostile work environment.

Gill also claims that he overheard Buck Gathwright, another maintenance employee, tell Eddie Gusby that he and Jerry Hunter went to the river and shot at a target they called "Little Eddie." Gill believed that the target was in reference to co-worker, Eddie Gusby. However, Gill

never reported what he overheard to management or the Union.

Although Gathwright's remark could be construed as physically threatening, it was not directed at Gill. Thus, it was not severe or pervasive enough to constitute a hostile work environment as to him. The comment was made by a single coworker on one occasion. Such an isolated incident is not enough to be a discriminatory change in the terms or conditions of one's employment. *Wallin,* 153 F.3d at 688. Also, Gill never complained about Gathwright's comment. Therefore, he can not show that the Defendants knew or should have known of the alleged harassment by Gill's coworker and failed to take proper action. *See Palesch v. Mo. Comm'n on Human Rights,* 233 F.3d 560, 566-67 (8th Cir. 2000). Thus, the comment of which Gill complains is insufficient to establish a cause of action for a hostile work environment.

Gill claims that John Woodall's statement to him that Woodall wanted "them guys to pick up the gloves" was racist. However, there is nothing inherently racial about this statement. Woodall's instruction was tied to the maintenance workers' job, not their race. It was also directed toward all the maintenance men in rendering which included Ron Cross, a Caucasian.

There is no evidence that Woodall's instruction to Gill was motivated by or based upon Gill's race. *See Schoffstall v. Henderson,* 223 F.3d 818, 826 (8th Cir. 2000). Thus, he was not subjected to unwelcome race-based harassment that affected a term or condition of his employment. This statement is not sufficient to support Gill's claim of a hostile work environment.

Gill claims that Walter Cribb, his Caucasian supervisor in the rendering department, harassed him by not recognizing him for the good job he did and by being negative all the time. He claims that Cribb thought he was a "dummy" even though Cribb never told him that.

While Cribb's negative attitude was unpleasant, being unpleasant does not affect a term or condition of one's employment. *Elmahdi,* 339 F.3d at 654.  Thus, Cribb's negative attitude is not sufficient to support Gill's claim of a hostile work environment.

Gill claims that in 2003, when the storage cooker broke, he overheard Cribb say to himself that "maintenance men need to be lined up and shot."  Gill admits that this comment was not directed at him personally and it did not affect his ability to do his job.  He also admits that the group of maintenance men to whom Cribb was referring included Ron Cross, a Caucasian.

Cribb's comment did not contain any racial slurs or racially derogatory language.  There was nothing inherently racial about the comment.  It did not affect Gill's ability to do his work. It was also directed to all the maintenance men in rendering, including Ron Cross.   There is no evidence that the comment was motivated by or based upon Gill's race. *See Schoffstall,* 223 F.3d at 826.  Thus, he was not subjected to unwelcome race-based harassment that affected a term or condition of his employment.  This statement is not sufficient to support Gill's claim of a hostile work environment.

Gill also claims that during 2003, Cribb hollered at him one time by saying, " well, my boss told me to keep ya'll right here, What ya'll going to do, ya'll going to do it."  Gill believed this outburst to be racist because he is a grown man, not a kid.

This outburst did not contain any racial slurs or racially derogatory language.  There is nothing inherently racial about it.  Thus, there is no evidence that it was motivated by or based upon Gill's race. *See Id.*  It also only happened on one occasion. Such an isolated incident will not amount to a discriminatory change in the term or conditions of one's employment. *Wallin,* 153 F.3d at 688.  It is not severe or pervasive enough to create a hostile environment.  Thus, this

one isolated outburst is insufficient to support Gill's claim of a hostile work environment.

Finally, Gill claims that profanity was directed to African-Americans at the plant. However, he does not claim that any profanity was ever directed toward him. Thus, the use of profanity did not affect a term or condition of Gill's employment and did not create a hostile work environment as to him.

The discrimination laws are not a general civility code. Thus, the abusive language of which Gill complains is not what a reasonable person would consider harassment. It was not severe or pervasive enough to amount to a discriminatory change in the terms and conditions of his employment. Thus, Gill has failed to establish a *prima facie* case of hostile work environment in connection with the alleged abusive language at the plant. Accordingly, the Court finds that this claim must fail as a matter of law.

*Racial Graffiti in the Bathroom*

Next, Gill claims that the presence of racial graffiti on the bathroom walls at the plant created a hostile work environment for him. Gill claims that the graffiti offended him "in a way" but he never complained to anyone about it. Gill admits that the bathrooms were painted by the Defendants. He also admits that the presence of the graffiti did not affect his ability to do his job.

In this instance, the graffiti was not specifically directed at Gill. It did not physically threaten him. It did not affect his ability to work. It was painted over by the Defendants. It is apparent that the presence of graffiti on the walls in the plant's bathroom was not sufficiently severe or pervasive enough to affect the terms and conditions of Gill's employment. *See Woodland,* 302 F.3d at 843-44. Thus, Gill has failed to establish a *prima facie* case of a hostile

work environment in connection with the presence of graffiti in the bathroom. Accordingly, the Court finds that this claim must fail as a matter of law.

### *African-American Employees treated Disrespectfully*

Gill claims that he was subjected to a hostile work environment when he witnessed African-American employees being treated differently than Caucasian employees in that they were treated in a disrespectful manner. Gill claims that this disrespect was evidenced by profane and demeaning language used toward African-American employees at the plant. Gill offers no evidence of any profanity used at the plant. The only evidence he offers of demeaning language involves the statements allegedly made by Walter Cribb and two unidentified Caucasian maintenance men in 1998 and 1987. These are not severe or pervasive enough to have affected a term or condition of Gill's employment. *See Bradley v. Widnall,* 232 F.3d 626, 631-32 (8th Cir. 2000). Thus, Gusby has failed to establish his *prima facie* case of hostile work environment in this regard. Accordingly, the Court finds that this claim must fail as a matter of law.

### *Unsafe Working Conditions*

Gill claims that African-American employees at the plant have been subjected to unsafe working condition. In support of this claim, Gill points to the fact that rendering maintenance men were required to pull the tarp over the feathers on the feather trucks.

There is no evidence that the alleged unsafe working conditions of which Gill complains was based upon or motivated by Gill's race. In fact, all maintenance men in rendering, African-American and Caucasian, had to perform this allegedly unsafe job. Thus, there is no evidence to support a claim of a hostile work environment in this regard. Accordingly, the Court finds that this claim must fail as a matter of law.

*Assignment of "Dirty" Jobs*

Gill claims that African-American employees were assigned the bad or "dirty" jobs while Caucasian employees were given the "clean" jobs. He claims that the jobs in rendering are "dirty and the jobs in the main plant are "clean."

The evidence before the Court does not support Gill's claim regarding "dirty" jobs. Rather, the evidence shows that the "clean" jobs in the main plant are overwhelming held by African-Americans. It also shows that the "dirty" jobs in rendering are done by Caucasians, as well as African-Americans. Thus, Gill's "dirty" job allegation cannot support his claim of a hostile work environment. Accordingly, the Court finds that this claim must fail as a matter of law.

Gill also claims that African-American employees were not placed in HAZMAT duty while Caucasian employees were. However, the evidence shows that Gill, an African-American, was placed in HAZMAT duty and he received HAZMAT pay. Thus, this allegation cannot support his claim of a hostile work environment. Accordingly, the Court finds that this claim must fail as a matter of law.

Finally, Gill claims that he was subjected to a hostile work environment because Walter Cribb assigned him production work along with his maintenance duties. A hostile work environment is created by verbal or physical harassment directed at an employee and based upon his membership in a protected class. This harassment must be sufficiently severe or pervasive to affect the terms or conditions of one's employment.

Here, Gill is not alleging that he was subjected to verbal or physical harassment. Rather, he is alleging acts of disparate treatment at the hands of the Defendants. While these acts may

have resulted in a frustrating work situation for Gill, they did not create a work environment permeated with discriminatory intimidation, ridicule or insult. Thus, there is insufficient evidence to support a claim of a hostile work environment in this regard. Accordingly, the Court finds that this claim must fail as a matter of law.

## CONCLUSION

For the reasons discussed herein above, the Court finds that Defendants' Motion for Summary Judgment should be and hereby is **granted**. A judgment of even date, consistent with this Opinion, will be issued.

IT IS SO ORDERED, this 30th day of September, 2008.

    /s/Harry F. Barnes
Hon. Harry F. Barnes
United States District Judge